THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. WALTER GODINEZ, Defendant-Appellant.

First District (6th Division)   No. 1—87—1824

Opinion filed November 9, 1989.

Louis B. Garippo, Ltd., of Chicago (Louis B. Garippo and Susan G. Feibus, of counsel), for appellant.

Cecil A. Partee, State's Attorney, of Chicago (Inge Fryklund, Gael O'Brien, and Paul Gliatta, Assistant State's Attorneys, of counsel), for the People.

JUSTICE McNAMARA delivered the opinion of the court:

Defendant, Walter Godinez, was found guilty of murder following a jury trial. The trial court sentenced defendant to a term of 40 years' imprisonment. On appeal, defendant contends that he was not proved guilty beyond a reasonable doubt due to insufficient identification testimony, and that the trial court erred in denying his motion to quash arrest and suppress evidence.

At a pretrial hearing on the motion to quash arrest and suppress evidence, Officer William Rose testified that he investigated the murder of Eduardo Soto, who was killed on April 28, 1986. On April 29, Rose interviewed neighbors, including gang members from the area, and learned that the murder was committed by members of the Latin Disciples street gang.

On April 30, Rose spoke to two confidential informants. At 7 p.m., one informant told him that one of the murderers was a Latin Disciple named "Wally," a person Rose knew to be defendant. At 10 p.m., the second informant, from whom Rose had previously received reliable information, told Rose that "Wally" had bragged that he killed the victim and that "Little Man," known to Rose to be another Latin Disciple named Julio Montes, was also involved. Later that evening, Rose and other officers arrested Montes. Montes began crying, stating that he did not shoot the victim, but that defendant had done it.

Officer Richard Guerrero testified that, later on April 30, defendant was taken into custody. The parties stipulated that defendant was not free to leave.

Montes testified at the hearing that he and defendant were Latin Disciples, that his nickname was "Little Man" and defendant's was "Wally." Montes told the police that defendant committed the murder.

The trial court denied defendant's motion to quash arrest and suppress evidence after concluding that the arrest was made with probable cause.

At trial, Officer Patricia Delgado testified that she found the victim lying in front of a home at 1653 North Francisco in Chicago.

George Monk testified for the State that at the time of the shooting he was seated by a window in his living room at 1656 North Francisco when he heard gunshots across the street. The man with the gun ran north, in front of the Rodriguez home, about 25 feet to a gangway at 1655 North Francisco. It took about 10 seconds to run the 25 feet. The man bent over a little bit as he ran. The offender had to open the gate toward him, which required switching an object from one hand to the other hand. The offender ran through the gangway and out of sight into an alley. Monk testified that there is a streetlamp in front of 1653 North Francisco, and the light shines against a three-story brick wall next to the gangway. Monk could not see the offender's face. He described the shooter as a male Hispanic with dark hair, 17 years old, 5 feet 7 inches tall and 125 pounds. (Defendant is 5 feet 9 inches tall and 175 pounds.)

Jean Rodriguez, 17 years old at the time of the shooting, testified for the State that she lived at 1653 North Francisco. She was in bed, awake, when she heard four gunshots. The head of her bed is next to a window on the first floor of her home. She immediately looked out the window and saw defendant open the gate, pass through it, slam the gate, and run past her window, through the gangway and into an alley, out of sight. She heard what she believed were keys jingling, and thought they were keys hanging on defendant's clothing. After the police arrived, Rodriguez did not tell the police what she had seen, although she had told her brothers. Rodriguez' mother had advised her not to get involved. Rodriguez' brother, however, notified the police that she had observed the offender.

Rodriguez looked at several hundred photographs at the police station over the next several days, but she did not identify the offender. The record is unclear as to whether defendant's photograph was in those photo arrays. Prior to the lineup on May 1, she met Officer Paulnitsky at a park because her mother refused to let Paulnitsky talk with Rodriguez. She was shown photographs at the park, but could identify no one. She was then taken to the police station, where she identified defendant in a lineup.

Photographs of Rodriguez' and Monk's homes showed the scene, including the gate and gangway through which the offender had run.

Paulnitsky testified for the State that when he spoke with Rodriguez at home on May 1, the family was arguing because they feared that Rodriguez or other family members would be harmed if she became involved. When Paulnitsky met Rodriguez at the park, the pho-

tographs he showed her included defendant's photograph, but Rodriguez did not identify it. At the lineup, Rodriguez immediately identified defendant.

Dr. Robert Kirschner of the medical examiner's office testified that he performed an autopsy on the victim. There were several close range gunshot wounds to the neck and head.

■■ ■ Defendant initially contends that he was not proved guilty of murder beyond a reasonable doubt because the State's identification evidence was inadequate. A reviewing court will not set aside a jury verdict unless the evidence is so improbable as to raise a reasonable doubt of guilt. (*People v. Goodum* (1984), 127 Ill. App. 3d 350, 468 N.E.2d 573.) Thus, we will not overturn a conviction unless, after viewing the evidence in a light most favorable to the prosecution, no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. (*Jackson v. Virginia* (1979), 443 U.S. 307, 61 L. Ed. 2d 560, 99 S. Ct. 2781, adopted in *People v. Young* (1989), 128 Ill. 2d 1, 538 N.E.2d 453.) The credibility of identification witnesses and the weight accorded their testimony is within the unique province of the trier of fact. (*People v. Weatherspoon* (1978), 63 Ill. App. 3d 315, 379 N.E.2d 849.) Where the identification of defendant forms the central question in a criminal prosecution, the testimony of even one witness is sufficient to convict where the witness is credible and viewed the accused under conditions permitting a positive identification to be made. *People v. Richardson* (1988), 123 Ill. 2d 322, 528 N.E.2d 612; *People v. Yarbrough* (1977), 67 Ill. 2d 222, 367 N.E.2d 663.

■■■ Defendant complains that Paulnitsky's showing Rodriguez photographs, including that of defendant, one hour before the lineup and after defendant was in custody was unduly suggestive. Photographic identifications conducted while a defendant is in custody do not taint subsequent lineup identifications where the photographs were not so impermissibly suggestive as to give rise to the substantial likelihood of irreparable misidentification. (*People v. Goka* (1983), 119 Ill. App. 3d 1024, 458 N.E.2d 26.) While the supreme court has expressed a preference for a lineup, instead of showing photographs, when a suspect is in custody and a lineup is feasible (*People v. Holiday* (1970), 47 Ill. 2d 300, 265 N.E.2d 634, cited in *People v. Duarte* (1979), 79 Ill. App. 3d 110, 398 N.E.2d 332), no *per se* rule has been established. Significantly, defendant bears the burden of showing that the photographs were unnecessarily suggestive and that they led to a substantial likelihood of misidentification. (*People v. Goka* (1983), 119 Ill. App. 3d 1024, 458 N.E.2d 26; *People v. Duarte* (1979), 79 Ill. App.

3d 110, 398 N.E.2d 332.) Here, defendant has failed to meet that burden. He has never attacked the photo array or the lineup. He has shown nothing to indicate there was undue suggestion made to the eyewitness through suggestive portrayal of defendant in the photograph or in the lineup. Moreover, Rodriguez was shown literally hundreds of photographs over a period of three days. In addition, Rodriguez identified defendant in court. See *People v. Duarte* (1979), 79 Ill. App. 3d 110, 398 N.E.2d 332.

■ The key to the admissibility and weight to be given an independent identification is its reliability. (*People v. Stringer* (1972), 52 Ill. 2d 564, 289 N.E.2d 631; *People v. Duarte* (1979), 79 Ill. App. 3d 110, 398 N.E.2d 332.) In assessing the reliability of an identification, the court considers five factors: the witness' opportunity to view the criminal at the time of the crime; the witness' degree of attention; the accuracy of the prior description of the criminal; the level of certainty demonstrated at the confrontation; and the length of time between the crime and the confrontation. See *Manson v. Brathwaite* (1977), 432 U.S. 98, 114, 53 L. Ed. 2d 140, 154, 97 S. Ct. 2243, 2253; *People v. Slim* (1989), 127 Ill. 2d 302, 537 N.E.2d 317.

Regarding the last four factors, Rodriguez closely gave attention to the criminal due to the gunshots in front of her home, the sound of the gate opening beneath her window, and the appearance of the man just outside her bedroom window. Rodriguez demonstrated a strong level of certainty, as indicated by both her testimony and the testimony of Paulnitsky. The record does not indicate what initial description Rodriguez gave to the police, and thus that factor does not establish reliability here. Rodriguez observed defendant in the lineup within several days of the crime, and that brief length of time supports the reliability of the identification.

The most troubling problem in this case involves the first factor, *i.e.*, the opportunity of the witness to view the criminal at the time of the crime. Monk testified that there was a streetlight in front of Rodriguez' home, and that the light shone upon the brick wall next to which the criminal was walking when Rodriguez saw him. Rodriguez' first-floor bedroom window looked right down upon the gate which the criminal opened, passed through, and the gangway which he used to reach the adjoining alley. The real weakness, if any, lies in the fact that the portion of the gangway within Rodriguez' view was only about 10 feet long. Thus, she had only a brief time within which to view the criminal.

Rodriguez testified that she had just gone to bed and was still awake when she heard the gunshots in front of her home. The head of

her bed is next to a window, and she immediately looked out. She saw defendant open the gate, pass through it, shut the gate, and go along the gangway into the alley. The time span, and her level of concentration, was sufficient to permit her to observe keys jingling against defendant's body, perhaps attached to his clothing. Despite exhaustive efforts on the part of defense counsel, on cross-examination Rodriguez adamantly maintained that she watched defendant pass through the gangway. When defense counsel focused on the short length of the gangway within Rodriguez' view, she still maintained, "Right, but I seen him when he passed—." When pressed again on the issue, Rodriguez steadfastly maintained that she was able to observe defendant. Moreover, Rodriguez never faltered in her identification, from the time of the lineup through the trial, despite testimony that she had been strongly urged by her family to withdraw as an identification witness in order to avoid any danger or repercussions from neighborhood gang members. Paulnitsky testified that Rodriguez and her family were in fear that she would be killed or that members of her family would be harmed.

In *People v. Duarte,* an in-court identification was found to be independently reliable notwithstanding the alleged suggestiveness of the pretrial identification procedures. The eyewitness observed defendant for a brief minute or two from his first-floor bedroom window, at a distance of 55 feet, through a one-inch opening in the window shade. He saw defendant enter an automobile for only 10 or 15 seconds, in an area lit by a streetlight. The court found the witness was close enough for a sufficient length of time and under adequate conditions for observation to permit an independent in-court identification.

■ Similarly, under the appropriate standard of review, viewing the testimony and the photographic exhibits in the record in a light most favorable to the prosecution, we must conclude that a rational jury could find the essential elements of a reliable identification which could support a conviction beyond a reasonable doubt. It is reasonable to find Rodriguez credible and find that she had sufficient time to observe the offender at a reasonable distance and under adequate lighting. See *People v. Trass* (1985), 136 Ill. App. 3d 455, 483 N.E.2d 867; *People v. Baker* (1979), 78 Ill. App. 3d 411, 396 N.E.2d 1174.

■ Defendant also contends that the trial court erred in denying his motion to quash arrest and suppress evidence because the informants' tips were not shown to be sufficiently reliable to support a finding of probable cause. We initially note that this argument overlooks the fact that Montes had told the police that defendant committed the murder. Moreover, Officer Rose testified that the second informant,

who reported that defendant had bragged about killing the victim, had previously given him reliable information. The basis of the informant's knowledge was information from defendant himself. The information was corroborated by Rose's prior investigation, in which he had learned that a Latin Disciple named "Wally," whom Rose knew to be defendant, was involved in the killing. From the officer's standpoint, considering his skill and knowledge at the time of the arrest, there was a substantial basis for concluding that probable cause existed. (See *Illinois v. Gates* (1983), 462 U.S. 213, 76 L. Ed. 2d 527, 103 S. Ct. 2317; *People v. Stout* (1985), 106 Ill. 2d 77, 477 N.E.2d 498.) No manifest error is apparent in the trial court's finding that probable cause to arrest defendant existed. See *People v. Stout* (1985), 106 Ill. 2d 77, 477 N.E.2d 498; *People v. Tisler* (1984), 103 Ill. 2d 226, 469 N.E.2d 147; *People v. Brett* (1984), 122 Ill. App. 3d 191, 460 N.E.2d 876.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Judgment affirmed.

EGAN, P.J., and LaPORTA, J., concur.